**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **AIMEE ERWIN,** | **:** | |
| | **:** | |
| **Plaintiff,** | **:** | **Case No. 2:20-cv-4350** |
| | **:** | |
| **v.** | **:** | **Chief Judge Algenon L. Marbley** |
| | **:** | |
| **HONDA NORTH AMERICA, INC.,** | **:** | **Magistrate Judge Kimberly A. Jolson** |
| | **:** | |
| **Defendant.** | **:** | |

**OPINION & ORDER**

This matter is before the Court on Defendant's Motion for Summary Judgment (ECF No. 21), and various other matters: Defendant's two Motions to Strike (ECF Nos. 25 & 26), Plaintiff's Motion to Supplement Affidavit (ECF No. 29), and Plaintiff's Motion to Supplement Discovery (ECF No. 30). The Court held oral argument on August 16, 2022. For the reasons that follow, Defendant's Motion for Summary Judgment (ECF No. 21) is **GRANTED,** Defendant's Motions to Strike (ECF Nos. 25 & 26) are **DENIED AS MOOT,** and Plaintiff's Motions to Supplement (ECF Nos. 29 & 30) are **DENIED.**

**I.   BACKGROUND**

On March 24, 2020, Plaintiff Aimee Erwin resigned her position as a recruiter for Defendant Honda North America, Inc. ("Honda"),[1] in what she alleges was a constructive discharge. (ECF No. 8 ¶ 6; No. 21 at 2).

Plaintiff had been in the recruiting position since 2017 and had worked about 24 years in total for Honda, across many roles. (ECF No. 23 at 2 (citing Erwin aff.)). While working as a

---

[1] Defendant notes that it "has been improperly named in this lawsuit"; the correct name of Plaintiff's employer was "American Honda Motor Co., Inc." (ECF No. 21 at i n.1). The Court will refer to Plaintiff's employer simply as "Honda" or "Defendant."

recruiter, Plaintiff invoked the Family and Medical Leave Act ("FMLA") several times. She took leave in May and June 2017, when her father was killed in a car accident—an event which culminated in diagnoses of depression and anxiety. (*Id.* (citing Erwin aff.)). Defendant approved Plaintiff again for intermittent FMLA leave between January and December 2018 (*Id.* (citing Erwin aff. & 2/2/18 leave approval letter)), which Plaintiff attempted to take that February. The February request was denied because Plaintiff's healthcare provider did not submit timely certification. (*Id.* (citing Erwin aff. & 3/12/18 leave denial letter)). This placed Plaintiff in violation of the absence policy and led to a telephone call with human resources to emphasize the importance of attendance. (*Id.* at 2 (citing 3/14/18 Record of Discussion)). A separate FMLA request was approved for March and April 2018. (*Id.* at 3 (citing Erwin aff. & 3/20/18 leave approval letter)).

When Plaintiff returned in April 2018, Defendant placed her on a performance improvement plan. (*Id.* (citing Erwin dep.); ECF No. 21 at 9 (citing 3/31/18 performance review & Holdheide dep.)). In a performance review covering the period from April 2017 to March 2018, Plaintiff received an overall rating of "Less than Successful Performance," with her reviewer specifically noting "lack of focus and attention to detail along with unplanned time off." (ECF No. 21-1 Ex. 4 (3/31/18 performance review)). In her deposition, Plaintiff accepted that she "was not performing at a hundred percent" on account of the trauma in her personal life. (ECF No. 21-1 (Erwin dep.), Tr. 86:3–16). Plaintiff responded to the performance review by stating she had inquired about "a reduced work schedule or part time," but "[n]o feedback was provided." (*Id.* Ex. 4 (3/31/18 performance review)). When two recruiting managers were deposed, they stated that Plaintiff was denied part-time work because "the request did not meet the guidelines and requirements" of Plaintiff's recruiting role (ECF No. 21-8 (McLemore dep.), Tr. 12:18–13:4),

which "was not a role that [Honda] could have at part-time because of the volume and the excess of work." (ECF No. 21-7 (Holland dep.), Tr. 17:1–16).

The next month, in May 2018, Plaintiff filed a compliance and ethics complaint with Honda's corporate office. (ECF No. 23-1 (Erwin aff.) ¶ 13). Plaintiff alleged "the FMLA leave policy and process was unevenly applied and not consistent." (ECF No. 23 at 3 (citing Erwin aff.)). After investigation, all allegations were deemed "unsubstantiated." (ECF No. 22-14 (10/19/19 Investigation and Closure Memo) at 2). The investigator concluded that "the failure in the process," referring to the February 2018 leave denial, "was the responsibility of [Plaintiff] because she did not submit her paperwork timely." (*Id.* at 1).

As of 2019, Plaintiff's duties had shifted from exclusively recruiting for full-time Honda associates to a "hybrid" role of full-time and contingent associate recruiting. (ECF No. 21 at 3 (citing Erwin dep.); ECF No. 23 at 3 (citing Kirk dep., McLemore dep.)). The hybrid role was expected to carry "less workload" at the same pay; and in her deposition, Plaintiff explained she did not prefer one type of recruiting to the other. (ECF No. 22-1 (Erwin dep.), Tr. 105:7–106:10). Plaintiff reported to Ms. Brandi Stewart for full-time recruiting and to Mr. Casey Kirk for contingent recruiting. (ECF No. 23 at 3 (citing Kirk. dep., McLemore dep.)).

Plaintiff again sought FMLA leave in November 2019. (ECF No. 21 at 2 (citing Stewart dep.); ECF No. 23 at 4 (citing Erwin aff.)). In the days prior to this request, Plaintiff had informed Ms. Stewart of problems in her daughter's household, which had left Plaintiff "very concerned about the well-being of her grandchildren." (ECF No. 21-2 (Stewart dep.), Tr. 24:16–25:16). Suspecting that this leave request might not be for a medical reason, Ms. Stewart reported the issue to human resources. (*Id.*, Tr. 23:4–24:8). Honda's third-party leave administrator, Sedgwick Claims Management Services, denied Plaintiff's FMLA request because Plaintiff had not sought

timely medical treatment. (ECF No. 21 at 3 (citing Stevens dep.)).[2] Nevertheless, Plaintiff was approved for leave under Honda's Medical Leave of Absence policy, which is broader than FMLA. (ECF No. 21-4 (Stevens dep.), Tr. 26:4–27:6).

With Plaintiff out on leave, Ms. Stewart covered part of Plaintiff's contingent recruiting responsibilities. (ECF No. 21 at 4 (citing Stewart dep., Kirk dep., Holdheide dep.); ECF No. 23 at 4 (citing Holdheide dep.)). In doing so, Ms. Stewart identified multiple "gaps" in Plaintiff's performance, summarized in the Motion as follows:

> (1) failure to update and save the master contingent tracking spreadsheet, (2) failure to have a documented process flow, and (3) failure to communicate with the compensation department regarding wage ranges.

(ECF No. 21 at 4–5 (citing Stewart dep., Kirk dep., McLemore dep., 12/16/19 discussion record); ECF No. 23 at 5 (citing Stewart dep., Kirk dep.)). A fourth "gap" initially was identified, relating to a retiree contractor program; but that later was determined not to be attributable to Plaintiff's performance. (ECF No. 21 at 5 n.2 (citing Kirk dep.); ECF No. 23 at 5 (citing Kirk dep.)).

Meanwhile, Plaintiff alleges (and Ms. Stewart denies) that Ms. Stewart was maligning Plaintiff's credibility and telling other employees Plaintiff had been "suspended." (ECF No. 23 at 4 (citing 1/24/20 Investigation and Closure Memo); ECF No. 24 at 8 n.1). Human resources investigated, substantiated the allegation, and coached Ms. Stewart "for inappropriately sharing confidential information." (ECF No. 22-12 (1/24/20 Investigation and Closure Memo) at 11).

Plaintiff's supervisors determined that another role realignment was warranted based on the performance gaps they had identified. While Plaintiff still was out on leave, her supervisors

---

[2] The denial came via a correction letter, after Sedgwick initially had credited Plaintiff's leave under FMLA. (ECF No. 22-15 (1/6/20 leave approval letter, 1/28/20 correction letter)). When the issue arose in the 2020 compliance and ethics investigation (discussed *infra*), the investigator found the approval letter was a clerical error by Sedgwick since Plaintiff "was not treated within seven days of the first day of incapacity, a requirement under FMLA." (ECF No 22-12 (1/24/20 Investigation and Closure Memo) at 4).

concluded Plaintiff would return to recruiting for full-time positions only. (ECF No. 21 at 6 (citing Stewart dep., Kirk dep.)). Mr. Joel Holland, a team manager, explained in his deposition that the full-time recruiting role "was easier to cover" if a recruiter needed to be absent and thus would lessen the "impact on the team." (ECF No. 21-7 (Holland dep.), Tr. 25:4–26:23). As a result of the realignment, Plaintiff would report solely to Ms. Stewart. (*Id.*, Tr. 26:24–27:2). Plaintiff's contingent recruiting duties went to Ms. Cheryl Crump, who previously had been working in a clerical support role. (ECF No. 21-2 (Stewart dep.), Tr. 31:14–21; ECF No. 23 at 4 (citing 1/24/20 Investigation and Closure Memo)).

When Plaintiff returned from FMLA leave in December 2019, Plaintiff's supervisors met with her to discuss the realignment and their performance expectations moving forward. (ECF No. 21 at 6–7 (citing Stewart dep., Kirk dep., Holdheide dep., McLemore dep., Erwin dep., 12/16/19 meeting summary)). In the meeting, Plaintiff took issue with the performance gaps and role realignment. (*Id.* at 7 (citing Stewart dep., Kirk dep., Holdheide dep., Erwin dep., 12/16/19 discussion record)). In addition to the change in duties, Plaintiff's realignment came with a change in desks, suspension of remote work and flexible hours, and a new requirement that she work from her desk for visibility purposes. (ECF No. 23 at 6 (citing 12/16/19 meeting summary, 12/6/19 Holdheide email, Holdheide dep.)). The removal of remote work was temporary while Plaintiff completed training. (ECF No. 21 at 7 (citing Stewart dep., Kirk dep., Holdheide dep., 12/16/19 meeting summary, 12/16/19 discussion record)). "[A]dding salt to the wound," Ms. Crump received recognition at a company event for her contributions to the contingent recruiting program. (ECF No. 23 at 7 (citing Holland dep., Erwin aff.)).

On January 3, 2020, Plaintiff filed a second compliance and ethics complaint with Honda's corporate office. (ECF No. 21 at 8 (citing Erwin dep.); ECF No. 23 at 8 (citing 1/24/20

Investigation and Closure Memo)). Plaintiff made three allegations, which the investigator summarized as follows:

1. Her November 2019 leave was inappropriately being questioned.
2. She was retaliated against by her supervisors Casey Kirk and Brandi Stewart for not responding to a text message by Stewart inappropriately requesting her log-in information, then for communicating her leave to Administration Division Man[a]ger Yvette Hunsicker and not to Brandi Stewart. Additionally, these actions violated her Family and Medical Leave Act ("FMLA") rights. The actions were:
   a. Removing her from a hybrid role that recruited for contingent associates and full-time Honda associates to have her solely as a "full-time recruiter";
   b. Removing her from the Contingent RFP Project that she had been on since its inception;
   c. Precluding her from using remote flexibility; and
   d. Alleging "false" performance gaps, making other associates aware of those gaps, and micromanaging her.
3. She was treated differently because she had a "mental condition" and was not permitted flexibility for working remotely compared to other associates who had "physical" health conditions.

(ECF No. 22-12 (1/24/20 Investigation and Closure Memo) at 1).

After reviewing documents and interviewing ten employees, the investigator found only one allegation to be substantiated: that "Contreras [of human resources] inappropriately directed Stewart to request Erwin's user name and password . . . so Erwin's customers could continue to be supported while Erwin was off work . . . in violation of Honda policy to keep passwords confidential." (*Id.* at 11). Mses. Contreras and Stewart were "verbally coached" by the compliance office on that issue. (*Id.* at 15). Regarding Ms. Stewart's other conduct, of allegedly maligning Plaintiff's credibility while Plaintiff was on leave, the investigator noted poor judgment and immaturity on Ms. Stewart's part but "did not find evidence of retaliation." (*Id.* at 13). Plaintiff's remaining allegations each were unsubstantiated. (*Id.* at 3–15).

Summarizing her findings, the investigator wrote:

1. Erwin received treatment after seven days, which did not qualify her for FMLA. Additionally, Erwin's doctor caused Sedgwick to question whether the leave was for her own medical condition or to gain custody of her grandchildren.
2. Erwin's inability to consistently comply with [Honda's] attendance policy and performance issues related to accurately and timely completing tasks caused the team to realign her roles and responsibilities to provide stability within the team, improve consistency within the role, and maintain customer service. The change in Erwin's role did not affect her salary or opportunities for advancement.
3. Erwin was provided adequate and ample opportunity to use Honda's flexibility options. Additionally, due to well documented performance concerns and lack of trust by her leadership, Erwin was appropriately precluded from using remote work until she can demonstrate full knowledge and ability of her full time recruiting role.

(*Id.* at 15). Notably, the attendance issues were *not* framed around Plaintiff's scheduled periods of medical leave. For the year 2019, the investigator documented 28 requests for remote work with under 24-hours' notice (13 of those being same-day requests), as well as 35 requests for PTO with under 24-hours' notice (22 of those being same-day requests). (*Id.* at 14).

During this time, Plaintiff was meeting with Ms. Michelle Pinnell, a clinical social worker and therapist, for panic attacks and anxiety regarding her work situation. (ECF No. 23 at 9–10 (citing Pinnell aff.)). Plaintiff sought FMLA leave from January 21, 2020, through March 25, 2020, which was approved. (*Id.* at 10 (citing 2/18/20 leave approval letter)). Per Plaintiff's affidavit, her "stress related to [her] previous experience when returning to Honda was very high," and she "was concerned . . . that there would again be alleged performance gaps identified, work reassignments and demotions, desk moves and restrictions, and restrictions on flexibility, and performance improvement plans as had been done in March 2018 and December 2019." (ECF No. 23-1 (Erwin aff.) ¶ 21).

Plaintiff did not return to work that March; she resigned from Honda as her FMLA leave was scheduled to end. (ECF No. 21-1 (Erwin dep.), Tr. 177:15–24). After about six months, Ms. Stewart received Plaintiff's resume for a contingent staffing role. (ECF No. 21 at 8 (citing Stewart

dep.)). At the time of Defendant's Motion, Plaintiff was working again at Honda through a staffing agency. (*Id.* (citing Stewart dep.)).

On July 27, 2020, Plaintiff sued Defendant in state court,[3] asserting five claims for relief: (1) disability discrimination; (2) failure to grant reasonable accommodations; (3) retaliation for protected conduct; (4) interference with or retaliation for taking FMLA leave; and (5) tortious infliction of emotional distress. (ECF No. 8). Defendant removed the case to federal court. (ECF No. 1). This Court did not adjudicate any remand motion, nor a motion to dismiss. On September 22, 2021, once discovery had closed, Defendant filed the instant Motion for Summary Judgment. (ECF No. 21). With briefing complete (ECF Nos. 23 & 24), the matter stands ripe for review.

## II.   STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Berryman v. SuperValu Holdings, Inc.*, 669 F.3d 714, 716–17 (6th Cir. 2012). The Court's role is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249. Evidence that is "merely colorable" or "not significantly probative" will not defeat summary judgment. *Id*. at 249–50.

The party seeking summary judgment shoulders the initial burden of presenting the Court with law and argument in support of its motion, as well as "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

---

[3] Though not raised directly in the briefing, Plaintiff had filed a charge of discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC") before initiating the state-court case. The charge is dated February 27, 2020, which coincides with Plaintiff's final period of FMLA leave. (*See* ECF No. 21-1, Ex. 16 (EEOC charge)).

affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). "If the moving party satisfies its burden, then the burden of going forward shifts to the nonmoving party to produce evidence that results in a conflict of material fact to be resolved by a jury." *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

"The Court views factual evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor." *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 511 (6th Cir. 2009). Even so, "[t]he mere existence of a scintilla of evidence to support [the nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (citing *Anderson*, 477 U.S. at 252).

### III.   LAW AND ANALYSIS

Defendant seeks summary judgment on all aspects of the Complaint. The Court will structure its analysis around Plaintiff's five causes of action, as follows.

### A.  Disability Discrimination (Count One)

Count One of the Complaint alleges disability discrimination, reasoning that "Erwin's health conditions, disability, and impairment were determining factors in Honda's conduct toward Erwin, and the constructive termination of Erwin." (ECF No. 8 ¶ 16). Though the Complaint does not identify specific statutes, it is clear from the briefing that Plaintiff is proceeding under the Americans with Disabilities Act ("ADA") and its state-law counterpart, O.R.C. § 4112.02. (*See* ECF No. 23 at 12). Since "'analysis of claims made pursuant to the Americans with Disabilities Act applies to claims made pursuant to Ohio Revised Code § 4112.02,'" the Court will evaluate the Ohio claims "concurrently and under the same standards as claims brought under

the ADA." *Nilles v. Givaudan Flavors Corp.*, 521 F. App'x 364, 367–68 (6th Cir. 2013) (quoting *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 201 (6th Cir. 2010)).

The Americans with Disabilities Act ("ADA") prohibits an employer from "discriminat[ing] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). "A plaintiff can bring a disability discrimination claim using either direct or indirect evidence, [and] the type of evidence presented determines the analytical framework to be used." *Denoewer v. Union Cty. Indus.*, 2020 WL 1244194, at *3 (S.D. Ohio Mar. 16, 2020).

Since Plaintiff is proceeding on an indirect evidence theory (*see* ECF No. 23 at 12), the *McDonnell Douglas* burden-shifting framework applies.[4] Plaintiff's *prima facie* case is summarized as follows:

> Plaintiff has the burden to show: (1) [s]he is disabled, (2) but otherwise qualified for the position with or without reasonable accommodation, (3) [s]he suffered an adverse employment decision, (4) Defendant[] knew or had reason to know of Plaintiff's disability, and (5) either the position remained open, [s]he was replaced by a non-disabled person, or a similarly-situated non-disabled employee was treated more favorably.

*Schwendeman v. Marietta City Sch.*, 436 F. Supp. 3d 1045, 1059–60 (S.D. Ohio 2020), *aff'd*, 2020 WL 7711327 (6th Cir. Dec. 14, 2020) (citing *Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011)). Once the *prima facie* case is satisfied, the burden shifts:

> The defendant must then offer a legitimate explanation for its action. If the defendant satisfies this burden of production, the plaintiff must introduce evidence showing that the proffered explanation is pretextual. Under this scheme, the plaintiff retains the ultimate burden of persuasion at all times.

---

[4] Defendant's Motion addressed both direct and indirect evidence. (ECF No. 21 at 12). Plaintiff responded only to the indirect evidence theory, framing her response under *McDonnell Douglas*. (ECF No. 23 at 12).

*Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 453 (6th Cir. 2004) (quoting *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1186–87 (6th Cir. 1996)).

Defendant does not advance any argument on Plaintiff's disability or its own knowledge thereof; but it does contest the other elements of the *prima facie* case. (ECF No. 21 at 12–17). Specifically, Defendant asserts: (1) Plaintiff cannot show she was qualified for her position; (2) Plaintiff cannot show she suffered an adverse employment action; and (3) Plaintiff was replaced by another disabled employee. (*Id.*). In the alternative, Defendant articulates what it believes is a "legitimate, non-discriminatory reason" for its decisions—specifically, "performance deficiencies"—and responds to allegations of pretext. (*Id.* at 17–19).

### 1.  Qualified Individual

Regarding whether Plaintiff was qualified, Defendant cites Plaintiff's own deposition testimony that, between May 2017 and January 2020, she was able to perform her job, "but not at a hundred percent." (ECF No 21-1 (Erwin dep.), Tr. 173:13–174:10). Pressed for a more precise percentage, Plaintiff estimated "50 percent." (*Id.*, Tr. 174:11–13). Defendant also reads the deposition to admit that Plaintiff "did not consider herself capable of working from the time she resigned in March 2020 until June or July 2020." (ECF No. 21 at 13). In response, Plaintiff argues she "was off work on FMLA at the time she resigned and that her condition at that time was related to Honda's conduct"; that "the reason for her leave was directly related to her treatment upon returning from a previous leave"; and that she had a long tenure with Honda marked by "mostly positive performance reviews" in her recruiting position. (ECF No. 23 at 12–13).

Construed fairly in Plaintiff's favor, the record does not support a conclusion that she was unqualified. First, the deposition is not as decisive as Defendant claims it to be. When Plaintiff was asked directly whether she was "capable of working at that time," referring to "March of

2020," Plaintiff answered "Yes," even while acknowledging she "was struggling emotionally, mentally." (ECF No 21-1 (Erwin dep.), Tr. 36:12–17). As for Plaintiff's estimate of "50 percent" performance, it is ambiguous whether Plaintiff was referring to the periods she worked, the periods she was on leave, or an average across time. The record is clear that Plaintiff's health ebbed and flowed, and she took leave during the worst periods. Furthermore, Plaintiff correctly raises her 24-year tenure with Honda and her performance reviews—which include a "Successful Performance" rating in the year after her improvement plan was initiated (*see* ECF No. 22-12 (1/24/20 Investigation and Closure Memo) at 2)—as evidence of her qualification. Thus, Plaintiff's deposition does not require summary judgment on the qualification prong.

## 2.  Adverse Employment Decision

Defendant devotes the bulk of its argument to the second *prima facie* element: an "adverse employment decision." To satisfy this element, Plaintiff "must show . . . a materially adverse change in the terms of her employment." *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 885 (6th Cir. 1996). Such a change "might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Broska v. Henderson*, 70 F. App'x 262, 267 (6th Cir. 2003) (quoting *Ford v. Gen. Motors Corp.*, 305 F.3d 545, 553 (6th Cir. 2002)). "Such action usually 'inflicts direct economic harm.'" *Freeman v. Potter*, 200 F. App'x 439, 442 (6th Cir. 2006) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 762 (1998)).

"A change in employment conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Broska*, 70 F. App'x at 267 (quoting *Kocsis*, 97 F.3d at 886). Therefore, "de minimis employment actions, such as '[r]eassignments without changes in

salary, benefits, title, or work hours usually do not constitute adverse employment actions.'" *Id.* (quoting *Policastro v. Nw. Airlines, Inc.*, 297 F.3d 535, 539 (6th Cir. 2002)). For actions to rise to a "constructive termination," as is Plaintiff's theory, the working conditions must be "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Kocsis*, 97 F.3d at 887 (quoting *Held v. Gulf Oil Co.*, 684 F.2d 427, 432 (6th Cir. 1982)).

In her opposition brief, Plaintiff raises the following events as potential adverse actions: "Erwin's removal from the contingent program, removal of remote and work flexibility, and being required to work at only her desk upon her return from FMLA leave in December 2019." (ECF No. 23 at 14). Additionally, Plaintiff argues, "a jury could determine that Erwin was demoted, as after her return from leave she was removed from her previous position, and Erwin was reporting primarily to Stewart who was lower in the organization structure than Kirk to whom she had previously reported, Erwin's job responsibilities were reduced as she was removed from a project she had been working on since its inception, and she was reassigned under Stewart." (*Id.*). These paragraphs of the brief are devoid of any citations to caselaw or record evidence. The Court will attempt to parse each argument; but it bears emphasizing that "[a] trial court is not required to speculate on which portion of the record the non-moving party relies, nor is there an obligation to 'wade through' the record for specific facts." *United States v. WRW Corp.*, 986 F.2d 138, 143 (6th Cir. 1993).

First, the record is clear that Plaintiff's transfer from "hybrid" to "full-time" recruiting is viewed fairly as a lateral move, not a demotion. Plaintiff's salary and benefits did not change, and she continued to do the same job function with the exception of the type of associate she recruited. (ECF No. 21 at 15 (citing Evans dep., Erwin dep.). Both roles were "Level 2 positions," and "[t]he change did not affect [Plaintiff's] salary or opportunities for advancement." (ECF No. 22-12

(1/24/20 Investigation and Closure Memo) at 11–12). Plaintiff has not identified record evidence to the contrary. By Plaintiff's own admission, neither position was "more favored than the other," and she "enjoyed both." (ECF No. 21-1 (Erwin dep.), Tr. 106:1–8). She also was permitted to continue working on the vendor project that initially was removed from her. (*Id.*, Tr. 145:3–14). Critically, Plaintiff has not countered the Sixth Circuit authority, cited by Defendant, that "[r]eassignments without changes in salary, benefits, title, or work hours usually do not constitute adverse employment actions." *Policastro*, 297 F.3d at 539.

With respect to other changes in work conditions that accompanied the reassignment, "removal of remote and work flexibility" was temporary while Plaintiff trained in the full-time recruiting role and cured the performance gaps her supervisors had identified. (ECF No. 23 at 14; No. 21 at 7 (citing Stewart dep., Kirk dep., Holdheide dep., 12/16/19 meeting summary, 12/16/19 discussion record)). Those changes, like the requirement to work at her desk, effectively were an "increase in supervision," which the Sixth Circuit has viewed as "a de minimis action that is simply not materially adverse." *Broska*, 70 F. App'x at 267.

A slightly stronger case could be made for Plaintiff's being "reassigned under Stewart." (ECF No. 23 at 14). Still, the change was smaller than Plaintiff presents it to be. At all relevant times, Plaintiff had reported to Ms. Stewart for the full-time portion of her hybrid role. The sole reporting change for Plaintiff upon her return to work in December 2019 was that she reported only to Stewart, rather than both Kirk and Stewart. (ECF No. 24 at 6–7 (citing Stewart dep., Kirk dep., McLemore dep., Erwin dep.)). Plaintiff argues she was demoted because Mr. Kirk "was on a higher rung of the organizational structure" than Ms. Stewart. (ECF No. 23 at 14).[5] Plaintiff does

---

[5] Per their own depositions, Mr. Kirk was a "manager" (ECF No. 21-6 (Kirk dep.), Tr. 6:8–14), and Ms. Stewart was a "coordinator" (ECF No. 21-2 (Stewart dep.), Tr. 4:23–25). As a coordinator, Ms. Stewart reported to a "manager," specifically Ms. Carol Holdheide. (ECF No. 22-4 (Stewart dep.), Tr. 20:10–19).

not explain the significance, however, of her direct supervisor's "rung," given that Plaintiff's *own* level and pay were unchanged. Regarding Ms. Stewart's maligning of Plaintiff's credibility (*see* ECF No. 23 at 14), "Honda disciplined Stewart for the alleged conduct." (ECF No. 24 at 8 n.1 (citing Stewart dep., Holdheide dep.); *see also* ECF No. 22-12 (1/24/20 Investigation and Closure Memo) at 11). This shows Defendant denounced the conduct and took affirmative steps to prevent its recurrence. At most, Plaintiff would have increased contact with a supervisor who had spoken negatively about her *and* been corrected for the same. On these facts, the Court is strained to identify any "materially adverse change in the terms of [Plaintiff's] employment." *Kocsis*, 97 F.3d at 885.

Plaintiff's constructive discharge theory falters on the same grounds. Insofar as the changes were not materially adverse, they also did not render Plaintiff's working conditions "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Id.* at 887 (internal quotation marks omitted). No matter how Plaintiff subjectively reacted to her role change, the Sixth Circuit also emphasizes "the employer's intent and the reasonably foreseeable impact of its conduct on the employee." *Wheeler v. Southland Corp.*, 875 F.2d 1246, 1249 (6th Cir. 1989) (quoting *Yates v. Avco Corp.*, 819 F.2d 630, 636–37 (6th Cir. 1987)). When facing similar employment actions to the ones at issue here, the Sixth Circuit frequently has rejected constructive discharge claims. *Spence v. Potter*, compiles several examples:

> [T]he manner in which an employer criticizes an employee's job performance, such as following rules, has been found insufficient to establish constructive discharge. *See, e.g.*, *Smith v. Henderson*, 376 F.3d 529, 534 (6th Cir. 2004); *Agnew v. BASF Corp.*, 286 F.3d 307, 310 (6th Cir. 2002) (discussing cases and finding no constructive discharge where employee contended he was unfairly criticized and placed on performance improvement plan); *Caslin v. Gen. Elec. Co.*, 696 F.2d 45, 47 (6th Cir. 1982) (same); *Bielert v. Northern Ohio Properties*, 863 F.2d 47 (6th Cir. 1988) ("An employer does not constructively discharge an employee simply by advising him that he must be productive in order to retain his new job."). On the spectrum, Plaintiff's case clearly falls on the job performance end, as there is no

15

> evidence other than Plaintiff's fears that his termination or demotion was imminent. Such fears are insufficient to defeat summary judgment. *See Wilson v. Firestone Tire & Rubber Co.*, 932 F.2d 510, 515 (6th Cir. 1991) (the employee has "an obligation not to assume the worst, and not to jump to conclusions too fast").

2010 WL 518179, at *12 (S.D. Ohio Feb. 3, 2010), *aff'd sub nom. Spence v. Donahoe*, 515 F. App'x 561 (6th Cir. 2013).

Plaintiff's brief does not engage with this weighty precedent. That Plaintiff returned to Honda six months later through a staffing agency (ECF No. 21 at 8 (citing Stewart dep.)) also belies her claim that the working conditions were so intolerable as to compel her resignation. Defendant's arguments on these points are well taken.

Thus, even when the facts are construed in Plaintiff's favor, the evidence does not support an "adverse employment decision." Defendant adjusted Plaintiff's job responsibilities via a lateral move, with no economic harm, and temporarily increased her level of supervision. Plaintiff has not raised a genuine dispute of material fact on this issue, so summary judgment is appropriate.

### 3. *Plaintiff's Replacement*

Defendant's final argument on the discrimination claim addresses the fifth *prima facie* element. As a threshold matter, Defendant has framed the element too narrowly, stating that Plaintiff "must show . . . she was replaced with a non-disabled individual." (ECF No. 21 at 12–13). While the standard test is phrased to focus on the replacement hire,[6] in recent cases a caveat typically follows: the element "may also be satisfied by showing that similarly situated non-protected employees were treated more fairly." *Bullard v. Fedex Freight, Inc.*, 218 F. Supp. 3d 608, 617 (M.D. Tenn. 2016) (quoting *Jones v. Potter*, 488 F.3d 397, 404 (6th Cir. 2007)); *see also*

---

[6] *See, e.g.*, *Hedrick*, 355 F.3d at 453 ("'(5) the position remained open while the employer sought other applicants or the disabled individual was replaced'").

*Schwendeman*, 436 F. Supp. 3d 1059–60 (expanding the element to include treatment of similarly-situated employees).

In any event, there appear to be disputed factual issues concerning the employee, Ms. Crump, who succeeded Plaintiff in her contingent recruiting role. Defendant avers that Ms. Crump also had a disability (ECF No. 21 at 17 (citing Stewart dep., Kirk dep., Holland dep.)); but the record is unclear whether Ms. Crump *remained* disabled at the relevant times. Ms. Crump suffered a broken foot, which led her doctor to recommend (and Defendant to approve) remote work "between August and November 2019." (ECF No. 22-12 (1/24/20 Investigation and Closure Memo) at 13). Ms. Crump could not have assumed Plaintiff's contingent recruiting responsibilities before mid-November 2019, at the earliest, when Plaintiff went on leave. (*See* ECF No. 23-1 (Erwin aff.) ¶ 16). The depositions on which Defendant relies do confirm Ms. Crump's broken foot, but none clarifies the timing of when Ms. Crump recovered versus when she moved into contingent recruiting. (*See* ECF No. 21-2 (Stewart dep.), Tr. 31:14–32:9; ECF No. 21-6 (Kirk dep.), Tr. 30:5–22; ECF No. 21-7 (Holland dep.), Tr. 29:23–30:9). If Ms. Crump had not recovered fully when she assumed Plaintiff's contingent recruiting duties, she at least was nearing her return to able-bodied status and regular in-person work.

A showing that Plaintiff was succeeded by a non-disabled individual would satisfy the final *prima facie* element. *See Schwendeman*, 436 F. Supp. 3d at 1059–60. Since there is a gap in the record on this issue, Defendant has not stated a separate ground for summary judgment.

Nevertheless, Plaintiff's inability to show an "adverse employment decision" means she cannot complete her *prima facie* case of disability discrimination. On that basis, summary judgment is **GRANTED** to Defendant on Count One. Since the *prima facie* case has failed, the

burden does not shift under *McDonnell Douglas*, and the Court need not resolve the parties' arguments on legitimate explanations and pretext.

### B.  Failure to Accommodate (Count Two)

Count Two of the Complaint alleges "Honda failed to reasonably accommodate Erwin's disability by[,] including but not limited to, denying Erwin's requests for a modified work schedule." (ECF No. 8 ¶ 21). Here too, the Complaint does not specify which laws it invokes. Defendant argues that any ADA claims would be time-barred, since Plaintiff's requests for a part-time work schedule occurred "between May 2017 and March 2018." (ECF No. 21 at 19 (citing Erwin dep.)). *See Thompson v. Fresh Prods., LLC*, 985 F.3d 509, 520 (6th Cir. 2021) ("[A]s under Title VII, an employee bringing [an ADA] claim has 180 (or 300) days after an adverse employment action to file a charge with the EEOC."). Plaintiff does not dispute this characterization of her claims (*see* ECF No. 23 at 16), so the Court will analyze the accommodation count under state law only.[7]

In Ohio, the elements of a failure-to-accommodate claim are as follows:

[E]mployees must demonstrate that (1) they were disabled, (2) the employer knew of the disability, and (3) they were qualified for the position, i.e., they met the prerequisites for the position and could perform the essential functions of the job with, or without, reasonable accommodations.

*DeCesare v. Niles City Sch. Dist. Bd. of Ed.*, 798 N.E.2d 655, 660 (Ohio Ct. App. 2003). "The burden is placed on the plaintiff to propose an accommodation that is objectively reasonable." *Barber v. Chestnut Land Co.*, 63 N.E.3d 609, 626 (Ohio Ct. App. 2016) (citing *Keith v. Cty. of Oakland*, 703 F.3d 918, 927 (6th Cir. 2013)).

---

[7] As of April 15, 2021, Ohio has a new, overarching two-year statute of limitations for employment discrimination claims. *See* Sub. H.B. 352, 133rd Gen. Assemb. (Ohio 2020) (codified at O.R.C. § 4112.052(C)(1)). Because the new law makes no mention of retroactivity, it does not apply to Plaintiff's claims. *See Bielat v. Bielat*, 721 N.E.2d 28, 32–33 (Ohio 2000) (discussing constitutional and statutory presumptions against retroactive legislation in Ohio).

Defendant challenges Plaintiff's qualification, as well as the reasonableness of a part-time work accommodation. (ECF No. 21 at 19–21). Both arguments rest on a common ground: that "working full-time was an essential function of her job." (*Id.* at 21). Sixth Circuit precedent,[8] raised in Defendant's brief, supports a "general rule—that regularly attending work on-site is essential to most jobs, especially the interactive ones." *EEOC v. Ford Motor Co.*, 782 F.3d 753, 761 (6th Cir. 2015). Defendant cites deposition testimony showing that "there were no part-time recruiters in the talent acquisition department in any role," since "the volume of work and nature of the responsibility of a recruiter were not appropriate for a part-time role." (ECF No. 21 at 21 (citing Holland dep., McLemore dep.)). Under these uncontroverted facts, full-time work was essential. *Cf. Green v. BakeMark USA, LLC*, 683 F. App'x 486, 492–93 (6th Cir. 2017) (where job required interaction and "at a minimum, fifty hours per week," employee's proposal of part-time work "was therefore unreasonable, and BakeMark was not required to provide it"); *White v. Standard Ins. Co.*, 529 F. App'x 547, 550 (6th Cir. 2013) (where company "had never employed [the position] on a part-time basis," employee's part-time work request was an unreasonable accommodation; company "was not required to create a new part-time position where none previously existed").

Plaintiff's response brief offers little to rebut these points. Citing only her affidavit, and no cases, Plaintiff claims "that other employees, including Crump[,] had been allowed to work from home and had been granted other accommodations." (ECF No. 23 at 16). Working from home, however, is different from working part-time, as Plaintiff had requested. The former, implemented correctly, does not affect the *volume* of work the employee can perform. Thus, the accommodation

---

[8] Though these are ADA cases, they apply equally to the state-law claim. *See Nilles*, 521 F. App'x at 367–68 ("'analysis of claims made pursuant to the Americans with Disabilities Act applies to claims made pursuant to Ohio Revised Code § 4112.02'").

for Ms. Crump's broken foot does not show that Plaintiff's request was reasonable. Summary judgment is **GRANTED** to Defendant on this Count.

### C. Retaliation (Count Three)

Count Three claims "Erwin was retaliated against based upon the protected conduct she had engaged in during her employment with Honda." (ECF No. 8 ¶ 24). Specifically, Plaintiff "actively opposed the discrimination and retaliation which was occurring, by including but not limited to, stating the conduct was improper, and requesting an investigation." (*Id.* ¶ 26). Continuing, Plaintiff alleges: "Erwin's constructive discharge was in response to, and based upon the protected conduct of Erwin, and was retaliatory, and was a determining factor [in] Erwin's constructive discharge as well as the other adverse employment actions taken against Erwin by Honda, including but not limited [to] changing Erwin's positions, investigating Erwin, and denying and removing Erwin's job benefits." (*Id.* ¶ 29). The briefing clarifies that Plaintiff intends to invoke the ADA and O.R.C. § 4112.02. (ECF No. 23 at 18).

As in Count One, the *McDonnell Douglas* framework applies to retaliation claims premised on indirect evidence. *Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014) (citing *A.C. v. Shelby Cty. Bd. of Educ.*, 711 F.3d 687, 697 (6th Cir. 2013)):

> The plaintiff bears the initial burden to establish a prima facie case of retaliation, which requires a showing that (1) the plaintiff engaged in activity protected under the ADA; (2) the employer knew of that activity; (3) the employer took an adverse action against plaintiff; and (4) there was a causal connection between the protected activity and the adverse action.

*Id.* Defendant contests the third and fourth elements. (ECF No. 21 at 22–23).

Insofar as Plaintiff has not shown an "adverse action" for purposes of her discrimination claim, she likewise cannot complete a *prima facie* case for retaliation using the same operative

facts.[9] Thus, for the reasons discussed *supra* Section III.A.2, summary judgment is **GRANTED** to Defendant on the retaliation claim. The Court need not reach the parties' arguments on causation, which overlap with the "legitimate explanation" and "pretext" stages of the *McDonnell Douglas* framework.

### D. FMLA Interference and Retaliation (Count Four)

Count Four of the Complaint sounds under the FMLA, alleging "Honda interfered with Erwin's FMLA leave, and retaliated against Erwin for taking FMLA leave, by including but not limited to, changing her work positions and titles upon her return, investigating Erwin, removing job benefits, and by making working conditions so intolerable that Erwin felt compelled to resign from her position." (ECF No. 8 ¶ 34).

The FMLA contains dual prohibitions on interference and retaliation. It is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the statute]"; and it is "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by [the statute]." 29 U.S.C. § 2615(a)(1), (2). The Complaint addresses both, as does Defendant's Motion. (*See* ECF No. 21 at 23–25 (interference), 25–27 (retaliation)). Plaintiff, however, responded only to "FMLA retaliation." (ECF No. 23 at 16–18). If Plaintiff intended to state an interference theory as well, she has waived the issue. *See Navigators Specialty Ins. Co. v. Guild Assocs., Inc.*, 2016 WL 6947933, at *10 (S.D. Ohio Nov. 28, 2016) ("A party waives opposition to an argument by failing to address it in her responsive brief.").

---

[9] One additional fact is raised, though without elaboration: "After filing the 2020 compliance and ethics complaint, Erwin's FMLA was initially approved then denied." (ECF No. 23 at 19). This concerned Plaintiff's November 2019 leave and the correction letter sent by Sedgwick on January 28, 2020. *See supra* note 2. Regardless, Defendant covered Plaintiff's leave under its own Medical Leave of Absence policy, which belies any inference that the clerical correction was retaliation for the ethics complaint. (ECF No 22-12 (1/24/20 Investigation and Closure Memo) at 4).

On the retaliation claim, a familiar test applies. Plaintiff must establish that:

(1) she was engaged in an activity protected by the FMLA; (2) the employer knew that she was exercising her rights under the FMLA; (3) after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to her; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action.

*Killian v. Yorozu Auto. Tenn., Inc.*, 454 F.3d 549, 556 (6th Cir. 2006) (citing *Arban v. West Publ'g Corp.*, 345 F.3d 390, 404 (6th Cir. 2003)).

Defendant contests the third and fourth elements. (ECF No. 21 at 25–27). As with the previous Count, Plaintiff's claim falters on the "adverse action" element, for the reasons discussed *supra* Section III.A.2. Therefore, summary judgment is **GRANTED** to Defendant on Count Four. The Court does not reach the parties' arguments on causation.

### E. Emotional Distress (Count Five)

Finally, Count Five is a state-law tort claim, alleging "Honda intentionally, recklessly, and/or negligently acted in an extreme and outrageous manner to as to [*sic*] cause physical injury and severe emotional distress to Erwin." (ECF No. 8 ¶ 38). "Ohio courts have held that claims for negligent infliction of emotional distress cannot be maintained in the employment context." *Morningstar v. Circleville Fire & EMS Dep't*, 2018 WL 1365842, at *16 (S.D. Ohio Mar. 16, 2018) (citing *Johnson v. Cox*, 1997 WL 152636, at *2 (Ohio Ct. App. Mar. 28, 1997)). Thus, Defendant analyzes Count Five under a theory of "reckless or intentional infliction of emotional distress." (ECF No. 21 at 27). Plaintiff does not object to this move. (*See* ECF No. 23 at 19).

To state a claim, Plaintiff must show the following:

(1) the defendant either intended to cause emotional distress, or knew or should have known that its actions would result in serious emotional distress; (2) defendant's conduct was so extreme and outrageous as to go beyond all possible bounds of decency, and would be considered utterly intolerable in a civilized community; (3) defendant's actions proximately caused injury to plaintiff; and (4)

the mental anguish plaintiff suffered is serious and of such a nature that no reasonable person could be expected to endure.

*Morningstar*, 2018 WL 1365842, at *17 (quoting *Osborne v. Douglas*, 2013 WL 6056490, at *11 (Ohio Ct. App. Nov. 15, 2013)).

In Count One, under the constructive discharge theory, Plaintiff was unable to show her working conditions were "'so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'" *Kocsis*, 97 F.3d at 887. Since that claim faltered, it would be exceedingly difficult for Plaintiff to meet the still-higher standard of "extreme and outrageous" conduct, "utterly intolerable in a civilized community." *Morningstar*, 2018 WL 1365842, at *17. Defendant's Motion raises two cases which found that the imposition of discipline, even if false or defamatory, was not "extreme and outrageous." *See Griswold v. Fresenius USA, Inc.*, 978 F. Supp. 718, 734 (N.D. Ohio 1997) (allegations of "ridicule[]," "foul language," and "falsely subject[ing] Plaintiff to discipline" did not amount to intentional infliction of emotional distress); *Hill v. Village of W. Lafayette*, 1996 WL 487943, at *5 (Ohio Ct. App. May 24, 1996) (same, for a "continuing pattern of harassment" carried out via "'false disciplinary charges'" and "allegedly defamatory conduct"). Plaintiff's two-sentence response in defense of her tort claim provides nothing to the contrary. (*See* ECF No. 23 at 19). Therefore, summary judgment is **GRANTED** to Defendant on Count Five.

## IV.  OTHER MATTERS

Also pending are several motions related to the affidavits: Defendant's two Motions to Strike (ECF Nos. 25 & 26) and Plaintiff's two Motions to Supplement (ECF Nos. 29 & 30). Defendant argues that portions of Plaintiff's affidavit "directly contradict [her] sworn deposition testimony or are not based on Plaintiff's personal knowledge" (ECF No. 25 at 1); and that portions of Ms. Pinnell's affidavit "contain hearsay statements; . . . are not based on personal knowledge;

and . . . improperly include expert testimony even though Plaintiff never disclosed the nature of Pinnell's opinions in discovery." (ECF No. 26 at 1). Plaintiff responded in defense of the affidavits. (ECF Nos. 27 & 28). Concurrently, Plaintiff moved to supplement her own affidavit "to the extent necessary" to show that the portions in question "are not in contradiction to her deposition testimony" and "are based upon Plaintiff's personal knowledge." (ECF No. 29 at 1). Plaintiff also moved to "supplement Plaintiff's Discovery for Michelle Pinnell," presumably to cure the disclosure issue. (ECF No. 30 at 1). Defendants oppose both requests for untimeliness and lack of specificity. (ECF Nos. 33 & 34).

With or without the objectionable portions of the affidavits, Defendant's summary judgment motion prevails. Therefore, Defendant's Motions to Strike (ECF Nos. 25 & 26) are **DENIED AS MOOT.** Regarding the supplements, Plaintiff will not be permitted to introduce further materials (to the extent she could), after the summary judgment motion ripened, to create genuine issues of material fact that do not exist on the record presented. Accordingly, Plaintiff's Motions to Supplement (ECF Nos. 29 & 30) are **DENIED.**

## V.   CONCLUSION

For the reasons stated above, Defendant's Motion for Summary Judgment (ECF No. 21) is **GRANTED,** Defendant's Motions to Strike (ECF Nos. 25 & 26) are **DENIED AS MOOT,** and Plaintiff's Motions to Supplement (ECF Nos. 29 & 30) are **DENIED.** The Clerk shall **ENTER JUDGMENT** for Defendant on all counts. This case is **CLOSED.**

**IT IS SO ORDERED.**

_____
**ALGENON L. MARBLEY**
**CHIEF UNITED STATES DISTRICT JUDGE**

**DATED: August 29, 2022**